# Exhibit A

**DEVERO TAUS LLC**
**211 SOMERVILLE ROAD, SUITE B**
**BEDMINSTER, NEW JERSEY 07921**
**(908) 375-8121**
**ATTORNEYS FOR PLAINTIFF**

UNOMA NWABUOKU,

      Plaintiff,

        v.

CVS CAREMARK CORPORATION , a
Massachusetts Corporation, and XYZ
Corporations 1-10, (said names being
fictitious),

      Defendants.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION
ESSEX COUNTY
DOCKET NO.:

Civil Action

**COMPLAINT AND JURY DEMAND**

Plaintiff, Unoma Nwabuoku ("Nwabuoku"), residing at 39 Wainwright Street, City of Newark, County of Essex and State of New Jersey, alleges as follows:

## FIRST COUNT

1.    Defendant CVS Caremark Corporation ("CVS") is a Massachusetts Corporation that operates and is licensed to do business in the State of New Jersey and has been authorized to conduct business and has conducted business in the state of New Jersey at all times relevant in this Complaint.

2.    Defendants XYZ Corporations 1-10 ("XYZ") are presently unidentified business entities that were employers of plaintiff and/or had ownership interest and/or control and/or management interest and/or otherwise were involved in the employment, harassment, discriminatory and/or retaliatory conduct at times relevant in this complaint. Plaintiff reserves the right to amend the complaint to include these parties should their identities be revealed in further discovery.

1

3.     Plaintiff Nwabuoku is a 39-year-old African American woman of Nigerian descent.

4.     Plaintiff Nwabuoku commenced employment with defendant CVS and/or XYZ in April of 2007. During her employment at CVS and/or XYZ, plaintiff Nwabuoku performed her job functions in a manner that met or exceeded the reasonable expectations of her supervisors.

5.     Plaintiff Nwabuoku was subjected to continuous and ongoing, severe and pervasive sexual harassment hostile work environment, and was retaliated against and was terminated due to her gender in express violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.* ("NJLAD") and in retaliation for exercising her legally protected right to oppose practices or acts outlawed by the NJLAD pursuant to N.J.S.A. 10:5-12(d) by defendants.

6.     In May 2008, Ms. Nwabuoku was working in the Hillside, NJ CVS helping a Pharmacist to assist a customer when her immediate supervisor, CVS Assistant Manager, Mufti Ahmad approached her from behind and grabbed her bottom.

7.     Ms. Nwabuoku immediately objected and immediately told Mr. Ahmad to stop his conduct.

8.     Mr. Ahmad responded that he was "looking for a temporary wife because his wife was out of town."

9.     Ms. Nwabuoku immediately informed her supervisor Mary Ann Ukhueduan, CVS Hillside, NJ Pharmacy Manager, who laughed off the incident.

10.    Later that same month, Mr. Ahmad touched Ms. Nwabuoku inappropriately. While Ms. Nwabuoku was standing near a register, Mr. Ahmad intentionally bumped into her while saying "nice boobs" and "nice butt."

2

11.     Ms. Nwabuoku instructed Mr. Ahmad to leave her alone and that his conduct was inappropriate.

12.     CVS Pharmacy Manager Ukhueduan witnessed this hostile work environment and sexual harassment, took no remedial action and, again, laughed at the incident.

13.     Assistant Manager Ahmad further demeaned Ms. Nwabuoku by calling her "Space" and wrote "Space" over her name on her name tag.

14.     Mr. Ahmad also made derogatory comments about Ms. Nwabuoku on a daily basis.

15.     In September 2008, Ms. Ukhueduan could not come into work due to an illness. As a result, a per diem pharmacist was called in to fill her shift.

16.     Per diem pharmacists frequently commented about Mr. Ahmad and his continued harassment of Ms. Nwabuoku.

17.     On numerous occasions, Assistant Manager Ahmad commented to CVS customers that Ms. Nwabuoku was stupid because she was an "illegal alien."

18.     This was clearly intended to draw attention to Ms. Nwabuoku's familial origin, as both of her parents are Nigerian.

19.     Ms. Nwabuoku asked Ms. Ukhueduan for the hotline number to report the conduct to CVS directly. Ms. Ukhueduan professed not to know the number, but instead counseled Ms. Nwabuoku not to make any complaints.

20.     Ms. Ukhueduan informed Ms. Nwabuoku that complaining about the conduct would only get her in trouble and instead said she would handle the issue.

3

21.     Ms. Nwabuoku then asked a per diem pharmacist if she knew the hotline number. In that instance, Ms. Nwabuoku was again counseled not to report the conduct and instead to "leave him to God. He will take care of it."

22.     On January 1, 2009, Ms. Nwabouku was again subjected to further harassment by Mr. Mufti and once again complained to Pharmacy Manager Ukhueduan. Ms. Ukueduan again failed to take the required action of effectuating prompt remedial measures.

23.     Mr. Mufti began retaliating against Ms. Nwabouku for objecting to his continuous harassment.  On January 2, 2009 Mr. Mufti told Ms. Nwabouku that he was going to have her fired.

24.     On January 17, 2009, Ms. Nwabouku reported all of the sexual harassment, racial and other discrimination and retaliation she had been subjected to by her supervisor, Assistant Manager, Ahmad,

25.     She also reported this Sexual Harassment, racial, and other discrimination to District Manager, Tom Arauno.

26.     Ms. Nwabuoku also informed Mr. Arauno that she had repeatedly complained about this conduct to supervisor and Pharmacy Manager, defendant Ukhueduan without any corrective or disciplinary action being taken.

27.     At Mr. Arauno's request, Ms. Nwabouku prepared a written statement regarding the harassment, discriminatory and retaliatory conduct and gave it to Mr. Arauno.

28.     CVS HR representative Jennifer Herbin finally conducted an investigation into Ms. Nwabouku's allegations in February 2009.   However, no proper investigative or remedial action was taken.

4

29.    In March of 2009, Ms. Nwabouku was placed on FMLA until June 30, 2009 because of a foot injury.

30.    However, Ms. Nwabouku's doctor cleared her to return to work in April of 2009.

31.    On April 3, 2009 Ms. Nwabouku called Head Pharmacist, Annabella Delapaz ("Delapaz") to tell her that she had been cleared to return to work.

32.    Ms. Delapaz advised Ms. Nwabouku that that there were very limited hours available at the Hillside store but that she should contact other nearby stores to see if they had any hours.

33.    Ms. Nwabouku worked one day at the Hillside store the week of April 17, 2009 but was never paid for this work.

34.    Ms. Nwabouku also worked one day at the Bloomfield the week of April 17, 2009. Ms. Nwabouku was also not paid for this day of work.

35.    Ms. Nwabouku called CVS several time about the missing pay check. However, she never received a response.

36.    Finally, Ms. Nwabouku was able to speak with District Manager, Mr. Arauno, who assured her that the paychecks would be straightened out.

37.    After conducting the investigation in the Hillside store in February of 2009, Defendants Mufti, Ukhueduan and many of Ms. Nwabouku's superiors and co-workers became even more hostile and increased their retaliatory conduct against her.

38.    Include among the retaliation and threats were frequent comments by her co-workers and supervisors demeaning Ms. Nwabouku including saying, "This isn't Africa!!!"

39.    Additionally, Ms. Nwabouku's weekly hours were also greatly reduced as a result of the discriminatory and retaliatory treatment.

40.     On April 19, 2009 Ms. Nwabouku contacted the NJ unemployment office and spoke to a representative. Ms. Nwabouku explained that she had been out on Medical leave in March but that when she tried to return to work she had her hours severely curtailed and had not received a paycheck for the hours which she worked.

41.     The unemployment representative advised Ms. Nwabouku to file for employment since her hours had been reduced significantly and because she had not been paid for the house she worked.

42.     The week of May 3, 2009 Ms. Nwabouku received her first unemployment check.

43.     On May 23, 2009 Ms. Nwabouku went to the Hillside store and spoke with Store Manager Andre Brown. She was finally advised by the Hillside Store manager that District Manager Arauno was allowing her to return to work.

44.     She returned to work on May 26, 2009 at the Hillside, NJ CVS store.

45.     However, after working on May 26, 2009 she was, told that there were no more hours available for her at the Hillside store.

46.     She also attempted to continue her employment at the Montclair, Union and Newark stores. However, she was repeatedly told that there were no hours for her at any CVS stores and she was terminated by the defendants on or about May 28, 2009.

47.     On May 29, 2009 Ms. Nwabouku noted that she still had not been paid for any of the days worked at either the Hillside or Bloomfield CVS. She contacted unemployment who informed her that she should continue to file for unemployment.

48.     Durring the last week of June 2009 Ms. Nwabouku received a letter from the NJ State Unemployment Office stating that CVS had advised that she was still an employee and therefore not entitled to unemployment benefits.

6

49.    Ms. Nwabouku called the Unemployment office and advised that she had not been given any hours by CVS since the end of May and had not been paid for any of the time she worked in April or May.

50.    The unemployment representative told Ms. Nwabouku that he would be in touch with CVS and gave her a date to call back about the issue.

51.    Ms. Nwabouku called the Unemployment office back at the end of June and continued to receive unemployment.

52.    During the first or second week of July 2009, CVS Pharmacy Manager Ukhueduan threatened that Ms. Nwabouku needed to keep her mouth shut or she would be physically harmed.

53.    This complaint is being timely filed in accordance with a tolling agreement entered between counsel for the parties.

54.    The disparate, discriminatory and retaliatory treatment that Ms. Nwabouku endured on an ongoing and continuous basis throughout her employment up and thereafter culminated in her wrongful termination and was was due to her gender, race, color and/or ethnic origin and was in express violation of the New Jersey Law Against Discrimination ("NJLAD"), *N.J.S.A.* 10:5-1 *et. seq.*

55.    Senior management of Defendants CVS and/or XYZ, including Assistant Store Manager Ahmad and Pharmacy Manager Ukhueduan and/or other upper level executives of Defendants CVS, either participated in or exercised willful indifference regarding Ms. Nwabouku's complaints of sexual harassment and discrimination due to her gender, race, color and/or ethnic origin that was committed with malice or a wanton and willful disregard of the people who may be harmed, entitling Plaintiff Nwabouku to punitive damages.

7

56.     Despite Plaintiff Nwabouku's repeated notifications and objections to this sexual harassment and discrimination, Defendants failed to timely and properly investigate and failed to provide an adequate or timely remedy.

57.     As a direct and proximate result of this continuous and ongoing discriminatory treatment due to her gender, race, color and/or ethnic origin culminating in her termination, Plaintiff Nwabouku suffered severe financial hardships, as well as severe emotional pain, suffering, mental trauma, and humiliation.

58.     At all times relevant to this Complaint, Ms. Ukhueduan, Mr. Ahmad and all other employees of Defendant CVS acted under the color of his/her/their positions in the capacity as Plaintiff's direct and indirect supervisor or as contractors performing work within the scope of employment, at the request of, and under the direction and control of, Defendants CVS and/or XYZ, and within the apparent scope of that authority. The outrageous and egregious actions, conduct and discriminatory treatment committed was willful, intentional, wanton, outrageous, reckless, malicious and were made with the intent to injure Plaintiff. The actual participation and/or willful indifference of these individual and/or other upper level executives or owners of Defendants CVS and/or XYZ regarding the discriminatory treatment in violation of the NJLAD set forth herein also make the Defendant employers liable for punitive damages.

59.     As a direct and causal result of this conduct, Plaintiff Nwabouku has suffered and continues to suffer substantial loss of income and other pecuniary harm, diminishment of career opportunity, business reputation, loss of esteem, physical injury, disruption of her personal life, emotional distress, trauma and anxiety and other irreparable harm, pain and suffering.

**WHEREFORE**, Plaintiff Unoma Nwabouku demands judgment against Defendants, CVS Caremark Corporation, XYZ Corporations 1-10 jointly and severally for money damages,

8

including but not limited to lost past and future wages, bonuses, employee benefits, and other perquisite damages for emotional distress, pain and suffering, humiliation, medical expenses for treatment and medication, and all other compensatory damages, attorney's fees, costs of suit, punitive damages, interest at the maximum legal rate on all sums awarded with pre-judgment and post-judgment interest, reimbursement of all lost wages and benefits and other relief that the court may deem appropriate.

## SECOND COUNT

60.     Plaintiff repeats and realleges each and every allegation of the First Count as if same were fully set forth herein.

61.     The NJLAD provides that all employees have the right to a workplace environment that is free of racial discriminatory intimidation, harassment and hostility.

62.     As previously set forth, Ms. Nwabouku was subjected to unwelcome, severe and pervasive, continuous and ongoing hostile work environment harassment throughout her employment up to her wrongful termination because of her sex and/or race and/or color and/or ethnic origin by Defendants, up to and including her final day of employment culminating in her termination, which a reasonable African American woman in the same or similar condition would consider sufficiently severe, pervasive to alter the conditions of her employment and create an intimidating, hostile or offensive working environment in direct violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1. *et. seq.* ("NJLAD").

63.     Defendants breached their duty by failing to investigate Ms. Nwabouku's complaints, or otherwise take effective measures to promptly remedy the underlying illegal, discriminatory, and retaliatory conduct of Defendants CVS, its employees, contractors and

9

agents and/or XYZ as mandated by the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et. seq.*

64.     As a direct and proximate result of the breach of the duty by the aforementioned defendants, plaintiff Nwabouku was subjected to an unlawful hostile work environment harassment, discriminatory and retaliatory conduct in violation of the NJLAD that culminated in her wrongful termination.

65.     At all times relevant to this Complaint, Defendants CVS, Ukhueduan, and/or John Does acted under the color of their position and in their capacity as Plaintiff's supervisors within the apparent scope of said authority and individually aided, abetted, incited, compelled and/or coerced the performance of the above-referenced unlawful hostile work environment harassment, discriminatory and retaliatory practices prohibited by the NJLAD.

66.     Accordingly, Defendants CVS, Ukhueduan, John Does and/or XYZ and all other unnamed employees of the Defendant employers are individually responsible for their actions in violation of the NJLAD and the Defendant employers are responsible for the actions of these named Defendants and all their employees and the damages sustained by Plaintiff as a result thereof.

67.     At all times relevant to this Complaint, Defendants acted under the color of his/her/their positions in the capacity as Plaintiff's direct and indirect supervisor performing work within the scope of employment, at the request of, and under the direction and control of Defendants CVS and/or XYZ and within the apparent scope of that authority.

68.     The outrageous and egregious actions, conduct, hostile work environment harassment, retaliatory and discriminatory treatment committed by the Defendants was willful, intentional, wanton, outrageous, reckless, malicious and were made with the intent to injure the

10

Plaintiff. The actual participation and/or willful indifference of these Defendants and/or other upper level executives of Defendants CVS and/or XYZ regarding the hostile work environment in violation of the NJLAD set forth herein also make the Defendant employers liable for punitive damages.

69.     As a direct and causal result of this hostile work environment and related discriminatory and retaliatory conduct that culminated in her wrongful termination, Plaintiff Nwabouku has suffered and continues to suffer substantial loss of income and other pecuniary harm, diminishment of career opportunity, business reputation, loss of esteem, physical injury, disruption of her personal life, emotional distress, trauma and anxiety and other irreparable harm, pain and suffering.

**WHEREFORE**, Plaintiff Unoma Nwabouku demands judgment against Defendants, CVS Caremark Corporation, and/or XYZ Corporations 1-10 jointly and severally for money damages, including but not limited to lost past and future wages, bonuses, employee benefits, and other perquisite damages for emotional distress, pain and suffering, humiliation, medical expenses for treatment and medication, and all other compensatory damages, attorney's fees, costs of suit, punitive damages, interest at the maximum legal rate on all sums awarded with pre-judgment and post-judgment interest, reimbursement of all lost wages and benefits and other relief that the court may deem appropriate.

## **THIRD COUNT**

70.     Plaintiff repeats and realleges each and every allegation of the First and Second Counts as if same were fully set forth herein.

71.    The NJLAD specifically provides that it is an unlawful employment practice to take reprisals against any person that has opposed practices, conduct or acts outlawed by the NJLAD.

72.    Plaintiff Nwabouku repeatedly objected to and opposed the harassment she was forced to endure and Defendants' discriminatory actions due to her gender, race, ethnicity, and/ or national origin that were in express violation of the NJLAD.

73.    Ms. Nwabouku' good faith objections to practices and/or acts prohibited by the NJLAD as set forth herein to Defendants, and mid-level and senior management of Defendants CVS and/or XYZ resulted in the direct and causally related retaliation set forth herein including, but not limited Ms. Nwabouku's severe reduction in hours and ultimate termination, which caused severe monetary damages and emotional pain, suffering, mental trauma, humiliation and anxiety in express violation of the NJLAD.

74.    Defendants' retaliatory actions and reprisals including, but not limited to Ms. Nwabouku's reduction and hours and her ultimate termination are a direct and causal result of Plaintiff Nwabouku's exercise of her legally protected rights in opposition to practices or acts outlawed by the NJLAD and are in clear violation of the NJLAD.

75.    Defendants were fully aware of the illegal conduct and practices prohibited by the NJLAD that had been committed.

76.    At all times relevant to this Complaint, Defendants CVS, and its employees, contractors and/or agents acted under the color of their position and in their capacity as Plaintiff's supervisors within the apparent scope of said authority and individually aided, abetted, incited, compelled and/or coerced the performance of the above-referenced unlawful hostile

12

work environment harassment, discriminatory and retaliatory practices prohibited by the NJLAD.

77.    Accordingly, Defendants CVS, and/or XYZ are responsible for their actions in violations of the NJLAD and the Defendant employers are responsible for the actions of all their employees and the damages sustained by Plaintiff as a result thereof.

78.    At all times relevant to this Complaint, all identified and unidentified employees of defendant CVS and/or XYZ acted under the color of his/her/their positions in the capacity as Plaintiff's direct and indirect supervisor performing work within the scope of employment, at the request of, and under the direction and control of Defendants CVS and/or XYZ and within the apparent scope of that authority.

79.    The outrageous and egregious actions, conduct, retaliatory and discriminatory treatment committed by the Defendants was willful, intentional, wanton, outrageous, reckless, malicious and were made with the intent to injure the Plaintiff. The actual participation and/or willful indifference of these Defendants and/or other upper level executives of Defendants CVS and/or XYZ regarding the hostile work environment in violation of the NJLAD set forth herein also make the Defendant employers liable for punitive damages.

80.    As a direct and causal result of this discriminatory and retaliatory conduct that culminated in her wrongful termination, Plaintiff Nwabouku has suffered and continues to suffer substantial loss of income and other pecuniary harm, diminishment of career opportunity, business reputation, loss of esteem, physical injury, disruption of her personal life, emotional distress, trauma and anxiety and other irreparable harm, pain and suffering.

**WHEREFORE,** Plaintiff Unoma Nwabouku demands judgment against Defendants, CVS Caremark Corporation, and/or XYZ Corporations 1-10 jointly and severally for money

13

damages, including but not limited to lost past and future wages, bonuses, employee benefits, and other perquisite damages for emotional distress, pain and suffering, humiliation, medical expenses for treatment and medication, and all other compensatory damages, attorney's fees, costs of suit, punitive damages, interest at the maximum legal rate on all sums awarded with pre-judgment and post-judgment interest, reimbursement of all lost wages and benefits and other relief that the court may deem appropriate.

**DEVERO TAUS LLC**
Attorneys for Plaintiff, Unoma Nwabouku

By: _____
    GREGORY A. DEVERO, ESQ.

Dated:  July 18, 2011

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues of fact and as to damages and as to punitive damages.

**DEVERO TAUS LLC**
Attorneys for Plaintiff, Unoma Nwabouku

By: _____
    GREGORY A. DEVERO, ESQ.

Dated:  July 18, 2011

## CERTIFICATION

I hereby certify that the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and further that no action or arbitration proceeding is contemplated.

DEVERO TAUS LLC
Attorneys for Plaintiff, Unoma Nwabouku

Dated: July 18, 2011

By: _____
GREGORY A. DEVERO, ESQ.

## DESIGNATION OF TRIAL COUNSEL

Plaintiff hereby designates Gregory A. Devero, Esq. as trial counsel.

## DEMAND FOR PRODUCTION OF INSURANCE AGREEMENTS

Pursuant to R. 4:10-2(b), demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action or to indemnify or reimburse for payment made to satisfy the judgment.

15

If so, please attach a copy of each, or in the alternative state, under oath and certification: (A) policy number; (b) name and address of insurer; (c) inception and expiration date; (d) names and addresses of all persons insured thereunder; (e) personal injury limits; (f) property damage limits; and (g) medical payment limits.

**DEVERO TAUS LLC**
Attorneys for Plaintiff, Unoma Nwabouku

Dated: July 18, 2011

By:_____
GREGORY A. DEVERO, ESQ.

16

# Exhibit B

**DEVERO TAUS, LLC**
211 Somerville Road, Suite B
Bedminster, New Jersey 07921
(908) 375-8142
**Attorneys for Plaintiff**

| | |
|---|---|
| UNOMA NWABUOKU, | SUPERIOR COURT OF NEW JERSEY |
| Plaintiff, | LAW DIVISION |
| | ESSEX COUNTY |
| v. | DOCKET NO. L-5946-11 |
| CVS CAREMARK CORPORATION , a | Civil Action |
| Massachusetts Corporation, and XYZ | |
| Corporations 1-10, (said names being | |
| fictitious), | **ACKNOWLEDGMENT OF SERVICE** |
| Defendants. | |

Service of the Track Assignment Notice, Case Information Statement,

Summons and Complaint  in this matter on behalf of CVS ~~Caremark Corporation~~ *Pharmacy, Inc.*

are hereby acknowledged this  1st  day of ~~July~~ *August*, 2011.

BY: _____

Richard DeAgazio, Esq.
Edwards & Angell *Palmer & Dodge LLP*

# Exhibit C

Filing Fee $50.00

## State of Rhode Island and Providence Plantations

### ARTICLES OF AMENDMENT
### TO THE
### ARTICLES OF INCORPORATION
#### OF

CVS, Inc.

Pursuant to the provisions of Section 7-1.1-56 of the General Laws, 1956, as amended, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation:

FIRST: The name of the corporation is  CVS, Inc.

SECOND: The shareholders of the corporation on  January 28  , 19 97 , in the manner prescribed by Chapter 7-1.1 of the General Laws, 1956, as amended, adopted the following amendment(s) to the Articles of Incorporation:

#### [Insert Amendment(s)]

The name of the corporation shall be changed to:

CVS Pharmacy, Inc.

STATE OF RHODE ISLAND

COUNTY OF Providence } SC.

At Providence _____ in said county on this _7th___ day of
_____February_____ , 1997 , personally appeared before me Peter F. Lubowsky
and Diane McDonagle-Glass , who, being by me first duly sworn, declared that they are the _____
Vice President and Assistant Secretary of CVS, Inc. _____

that they signed the foregoing document as Vice President _____ and _Assistant Secretary_ of the
corporation, and that the statements therein contained are true.

Jee M. Goddard
_Notary Public_

(NOTARIAL SEAL)

JILL M GODDARD
Notary Public of Rhode Island
My Commission Expires: 10-04-00

FILED

FEB 1 0 1997
La Vott
Ch 178321

FEB 10 11 38 PM '91

STATE OF R.I.
RECEIVED

Filing fee: $100.00

## ARTICLES OF MERGER
## OF DOMESTIC CORPORATIONS
## INTO

CVS DISTRIBUTION, INC.
(to be known as CVS, INC. following the merger)
Pursuant to the provisions of Chapter 7-1.1 of the General Laws, 1956, as amended,
the undersigned corporations adopt the following Articles of Merger for the purpose of
merging them into one of such corporations:

FIRST: The following Plan of Merger was approved by the shareholders of each of
the undersigned corporations in the manner prescribed by said Chapter 7-1.1:

(Insert Plan of Merger)

(SEE ATTACHED)

FILED

SEP 2 1 1995

By

16752?

FORM 17A

evening1

## PLAN AND AGREEMENT OF MERGER

This PLAN AND AGREEMENT OF MERGER entered into this 26th day of September, 1996, made pursuant to Title 7, Chapter 1.1, Section 65 of the Rhode Island General Laws of 1956, as amended and Section 368(a)(1)(A) of the Internal Revenue Code of 1986, as amended by and among CVS Distribution, Inc., a Rhode Island corporation having its principal place of business in the City of Woonsocket, County of Providence and State of Rhode Island, said corporation is hereinafter referred to as "Distribution" and CVS, Inc. and CVS Merger, Inc., both Rhode Island corporations having their principal places of business in the City of Woonsocket, in the County of Providence and State of Rhode Island, said corporations are hereinafter referred to as "Inc." and "Merger", respectively.

### WITNESSETH

WHEREAS, Distribution, Merger and Inc. deem it advisable and generally for the welfare of said corporations and their respective shareholders that they merge into a single corporation.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and in consideration of the mutual covenants herein contained, the parties do hereby agree upon and prescribe the terms and conditions of said merger and of carrying the same into effect as follows:

1. Merger and Inc. shall be and hereby are merged into Distribution pursuant to Title 7, Chapter 1.1, Section 65 of The Rhode Island General Law of 1956, as amended and Section 368 (a)(1)(A) of the Internal Revenue Code of 1986, as amended.

2. Distribution (hereinafter sometimes called the "Surviving Corporation") shall continue to exist under and by virtue of, and shall be governed by, the laws of the State of Rhode Island.

3. The Surviving Corporation shall be known by the name of CVS, Inc.

4. The Surviving Corporation shall be located in the City of Woonsocket, in the County of Providence and State of Rhode Island.

5. The purposes for which the Surviving Corporation is organized are:

(a) Those purposes set forth in the Surviving Corporation's Articles of Incorporation.

1

(b) The transaction of any or all lawful business for which corporations may be incorporated under Title 7, Chapter 1.1 of the Rhode Island General Laws of 1956, as amended.

In addition to the foregoing, the Surviving Corporation shall have and possess all of the powers and authorities conferred by the Rhode Island General Laws of 1956, as amended upon every business corporation incorporated under the laws of the State of Rhode Island and the Articles of Incorporation of Distribution shall be Articles of Incorporation of the Surviving Corporation.

6. The registered office of the Surviving Corporation shall be 170 Westminster Street, Suite 900, Providence, Rhode Island and the Registered Agent of the Corporation at such office shall be United States Corporation Company.

7. There shall be no authorized capital stock of the Surviving Corporation with par value.

The amount of authorized capital stock of the Surviving Corporation without par value shall be 1,000 shares of Common Stock.

Each share of Common Stock shall be entitled to one (1) vote.

Said stock (or portions thereof) shall be issued by the Surviving Corporation in exchange for shares of Merger and Inc. as hereinafter provided.

8. The period of duration of the Surviving Corporation shall be perpetual.

9. The by-laws of Distribution shall remain and be the by-laws of the Surviving Corporation until the same shall be altered or amended according to the provisions thereof.

10. There shall be a Board of Directors of the Surviving Corporation which shall have and possess all of the powers and authorities which have been heretofore conferred upon the Board of Directors of Distribution.

11. The Board of Directors of Distribution shall be the Board of Directors of the Surviving Corporation and shall continue in office until their successors shall have been duly elected and qualified.

12. The officers of Distribution shall be the officers of the Surviving Corporation and shall continue in office until their successors shall have been duly elected and qualified.

13. Subsequent to the effective time of the merger the capital stock of Distribution shall be converted into the capital stock of the Surviving Corporation as follows:

Nashua Hollis CVS, Inc. ("Nashua Hollis"), the holder of all of the issued and outstanding shares of common stock of Distribution and Inc., shall surrender for cancellation all of said shares to the Surviving Corporation which shall in turn issue shares of its common stock for such

2

surrendered shares on the following basis: Nashua Hollis shall hold the percentage of stock of the Surviving Corporation determined by multiplying the issued and outstanding stock of the Surviving corporation by a fraction, the numerator being the combined value of Distribution and Inc., as set forth in the valuation reports to be issued by Gordon Associates, Inc., and the denominator being the total value of the Surviving Corporation and its subsidiaries as determined by (i) calculating the average of the high and low trading price of Melville Corporation ("Melville") on the New York Stock Exchange (as reported in the Wall Street Journal) on the first day of trading after the stock of Footstar, Inc. is distributed by Melville to its shareholders, and (ii) subtracting from the value derived in clause (i) the book value of Melville and all of its direct and indirect subsidiaries, excluding the direct and indirect subsidiaries of CVS Center, Inc. ("CVS Center"). Because the denominator can not be calculated until after the merger is effective, good faith estimates will initially be used to calculate the amount of stock to be issued to Nashua Hollis, with such amount being adjusted as promptly as practicable after a final calculation of the denominator can be performed. CVS Center, the holder of all of the issued and outstanding shares of common stock of Merger shall surrender for cancellation all of said shares to the Surviving Corporation which shall in turn issue to CVS Center shares of the Surviving Corporation representing the remaining percentage of stock in the Surviving Corporation.

Any and all of the issued common stock of Merger and Inc. held in their respective treasuries at the effective time of the merger shall be cancelled and shall not be converted.

14. Upon the merger becoming effective, all the property rights, privileges, franchises, patents, trade secret processes, trademarks, licenses, powers and other assets of every kind and description of Merger and Inc. shall be transferred to, vested in and devolve upon the Surviving Corporation without further act or deed; and all property, rights and every other interest of the Surviving Corporation, Merger and Inc. shall be as effectively the property of the Surviving Corporation as they were of the Surviving Corporation, Merger and Inc. respectively. Merger and Inc. each hereby agree from time to time, as and when requested by the Surviving Corporation or by its successors and assigns, to execute and deliver or cause to be executed and delivered all such deeds and instruments and to take or cause to be taken such further or other action as of the Surviving Corporation may deem necessary or desirable in order to vest in and confirm to the Surviving Corporation title to and possession of any property Merger and/or Inc. acquired or to be acquired by reason of or as a result of the merger herein provided for and otherwise to carry out the intent and purposes hereof and the proper officers and directors of Merger and/or Inc. and the proper officers and directors of the Surviving Corporation are fully authorized in the name of Merger and/or Inc. or otherwise to take any and all such action.

15. The Surviving Corporation assumes and agrees to pay and satisfy all of the expenses incurred by the parties hereto for the purposes of consummating the transaction contemplated hereby and to pay and satisfy in accordance with their terms all debts, liabilities and obligations of Merger and Inc. including without limitation, tax liabilities, and all rights of creditors, taxing authorities and all liens upon the property of Merger and Inc. shall be preserved unimpaired and all debts, liabilities and duties, including without limitation tax liabilities of Merger and Inc. from and after the date of merger shall

3

attach to the Surviving Corporation and may be enforced against it to the same extent as if said debts, liabilities and duties including without limitation, tax liabilities had been incurred or contracted by it.

16. An executed copy of this Agreement shall be filed in the Office of the Secretary of State of the State of Rhode Island. The merger provided for herein shall become effective on September 29, 1996 at 12:01 A.M. and upon the issuance of a Certificate of Merger by the Rhode Island Secretary of State.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective corporate officers hereunto duly authorized as of the day and year first above set forth.

**CVS DISTRIBUTION, INC.**

By: _____
Name: Thomas M. Ryan
Title: President

By: _____
Name: Zenon P. Lankowsky
Title: Secretary

**CVS, INC.**

By: _____
Name: Thomas M. Ryan
Title: President

By: _____
Name: Zenon P. Lankowsky
Title: Secretary

**CVS MERGER, INC.**

By: _____
Name: Thomas M. Ryan
Title: President

By: _____
Name: Zenon P. Lankowsky
Title: Secretary

4



STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

Department of Administration
DIVISION OF TAXATION
One Capitol Hill
Providence, RI 02908-5800

FAX (401) 277-6006

September 24, 1996

TO WHOM IT MAY CONCERN:

Re:  CVS, INC.

It appears from our records that the abovenamed
corporation has filed all of the required Business
Corporation Tax Returns due to be filed and paid all taxes
indicated thereon and is in good standing with this
Division as of this date regarding any liability under the
Rhode Island Business Corporation Tax Law.

This letter is issued pursuant to the request of the
abovenamed corporation for the purpose of:

A MERGER – CORPORATION IS THE NONSURVIVOR

Very truly yours,

R. Gary Clark
Tax Administrator

Ernest A. DeAngelis
Chief Revenue Agent
Corporations

TDD (401) 277-6287     (Telecommunication Device for the Deaf)



STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

Department of Administration
DIVISION OF TAXATION
One Capitol Hill
Providence, RI 02908-5800

FAX (401) 277-6006

September 24, 1996

TO WHOM IT MAY CONCERN:

Re:  CVS MERGER, INC.

It appears from our records that the abovenamed
corporation has filed all of the required Business
Corporation Tax Returns due to be filed and paid all taxes
indicated thereon and is in good standing with this
Division as of this date regarding any liability under the
Rhode Island Business Corporation Tax Law.

This letter is issued pursuant to the request of the
abovenamed corporation for the purpose of:

A MERGER — CORPORATION IS THE NONSURVIVOR

Very truly yours,

R. Gary Clark
Tax Administrator

Ernest A. DeAngelis
Chief Revenue Agent
Corporations

TDD (401) 277-6287      (Telecommunication Device for the Deaf)

SECOND: As to each of the undersigned corporations, (except one whose shareholders are not required to approve the agreement under § 7-1.1-67, in which event that fact shall be set forth), the number of shares outstanding, and the designation and number of outstanding shares of each class entitled to vote as a class on such Plan, are as follows:

| Name of Corporation | Number of Shares Outstanding | Entitled to Vote as a Class | |
|---|---|---|---|
| | | Designation of Class | Number of Shares |
| 1. CVS, INC. | 100 | COMMON | 100 |
| 2. CVS MERGER, INC. | 1 | COMMON | 1 |
| 3. CVS DISTRIBUTION, INC. | 1,000 | COMMON | 1,000 |

THIRD: As to each of the undersigned corporations, the total number of shares voted for and against such Plan, respectively, and, as to each class entitled to vote thereon as a class, the number of shares of such class voted for and against such Plan, respectively, are as follows:

| Name of Corporation | Total Voted For | Total Voted Against | Number of Shares Entitled to Vote as a Class | | |
|---|---|---|---|---|---|
| | | | Class | Voted For | Voted Against |
| 1. CVS, INC. | 100 | 0 | COMMON | 100 | 0 |
| 2. CVS MERGER, INC. | 1 | 0 | COMMON | 1 | 0 |
| 3. CVS DISTRIBUTION, INC. | 1,000 | 0 | COMMON | 1,000 | 0 |

FOURTH: Time merger to become effective (§ 7-1.1-69): SEPTEMBER 29, 1996

Dated September 26, 1996

CVS, INC.

By THOMAS M. RYAN
Its President

and ZENON P. LANKOWSKY
Its Secretary

CVS MERGER, INC.

By THOMAS M. RYAN
Its President

and ZENON P. LANKOWSKY
Its Secretary

CVS DISTRIBUTION, INC.

By: THOMAS M. RYAN
Its President

By: ZENON P. LANKOWSKY

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE
} Sc.

At Woonsocket, Rhode Island in said County on the 26th day of September 1996, before me personally appeared Thomas M. Ryan, who being by me first duly sworn, declared that he is the President of CVS, INC., that he signed the foregoing document as such President of the corporation, and that the statements therein contained are true.

_Ellen E. Putnam_
*Notary Public*

Ellen E. Putnam, Notary Public
Pascoag, Providence Co., RI
My Commission Expires: 07-02-97

(NOTARIAL SEAL)

STATE OF RHODE ISAND
COUNTY OF PROVIDENCE
} Sc.

At Woonsocket, Rhode Island in said county on the 26th day of September 1996, before me personally appeared Thomas M. Ryan, who being by me first duly sworn, declared that he is the President of CVS MERGER, INC., that he signed the foregoing document as such President of the corporation, and that the statements therein contained are true.

_Ellen E. Putnam_
*Notary Public*

Ellen E. Putnam, Notary Public
Pascoag, Providence Co., RI
My Commission Expires: 07-02-97

(NOTARIAL SEAL)

~20 50

Filing Fee $30.00

14414

## State of Rhode Island and Providence Plantations

### ARTICLES OF AMENDMENT
### TO THE
### ARTICLES OF INCORPORATION
### OF

Mark Steven Service Merchandisers, Inc.

Pursuant to the provisions of Section 7-1.1-56 of the General Laws, 1956, as amended, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation:

FIRST: The name of the corporation is ____Mark Steven Service Merchandisers, Inc.

SECOND: The shareholders of the corporation on ____June 27____, 1995, in the manner prescribed by Chapter 7-1.1 of the General Laws, 1956, as amended, adopted the following amendment(s) to the Articles of Incorporation:

### [Insert Amendment(s)]

FIRST:    "The name of the Corporation is:  CVS Distribution, Inc.

FILED

OCI 27 1995

By _____

150749

CC 1:: 95 11  1 330

FORM 12A

STATE OF RHODE ISLAND
COUNTY OF _Providence_ } SC.

At _Woonsocket_ in said county on this _11th_ day of _July_, 19_95_, personally appeared before me _Charles Conaway_, who, being by me first duly sworn, declared that he is the _Vice President_ of _Mark Steven Service Merchandisers, Inc._ that he signed the foregoing document as _Vice President_ of the corporation, and that the statements therein contained are true.

_Suzanne R. Pearl_
**Notary Public**

(NOTARIAL SEAL)

Suzanne R. Pearl, Notary Public
Woonsocket, Providence Co., RI
My Commission Expires 8-5-96



CVS/PHARMACY
DIVISION OF MELVILLE CORPORATION

September 6, 1995

Dear Sir/Madam:

I, Zenon Lankowsky, Vice President of CVS, Inc., do hereby consent to the Amendment and use of the Name Mark Steven Service Merchandisers, Inc. to CVS Distributions, Inc. and it will in no way interfere with the name CVS, Inc.

Thank you.

Very truly yours,

Zenon Lankowsky
Vice President of
CVS, Inc.

ONE CVS DRIVE • WOONSOCKET, RHODE ISLAND 02895 • (401)765-1500

January 8, 1973

MARK STEVEN WAREHOUSE STORE, INC.
400 Founders Drive
Woonsocket, Rhode Island 02895

TO WHOM IT MAY CONCERN:

MARK STEVEN WAREHOUSE STORE, INC. hereby consents to the change of the name of Mark Steven, Inc. to Mark Steven Service Merchandisers, Inc. and to the use by such corporation of the new name Mark Steven Service Merchandisers, Inc.

MARK STEVEN WAREHOUSE STORE, INC.

By _____
                President

Filing fee: $20.00

## State of Rhode Island and Providence Plantations

### ARTICLES OF AMENDMENT
### TO THE
### ARTICLES OF INCORPORATION
### OF

Mark Steven, Inc.

Pursuant to the provisions of Section 7-1.1-56 of the General Laws, 1956, as amended, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation:

FIRST: The name of the corporation is    Mark Steven, Inc.

SECOND: The shareholders of the corporation on    January 5,    , 1973, in the manner prescribed by Chapter 7-1.1 of the General Laws, 1956, as amended, adopted the following amendment(s) to the Articles of Incorporation:

[Insert Amendment(s)]

Article First of the Articles of Incorporation is hereby amended to read:

"The name of the corporation is Mark Steven Service Merchandisers, Inc."

All other provisions of the Articles of Incorporation shall remain unchanged.

The foregoing amendment shall be effective upon the issuance by the Secretary of State of the State of Rhode Island of the Certificate of Amendment.

FORM 17A 10M 1-70

THIRD: The number of shares of the corporation outstanding at the time of such adoption was ___1,000___; and the number of shares entitled to vote thereon was ___1,000___

FOURTH: The designation and number of outstanding shares of each class entitled to vote thereon as a class were as follows: (if inapplicable, insert "none")

| Class | Number of Shares |
|-------|------------------|
| None  |                  |

FIFTH: The number of shares voted for such amendment was ___1,000___; and the number of shares voted against such amendment was ___None___

SIXTH: The number of shares of each class entitled to vote thereon as a class voted for and against such amendment, respectively, was: (if inapplicable, insert "none")

| Class | Number of Shares Voted | |
|-------|------|---------|
|       | For | Against |
| None  |     |         |

SEVENTH: The manner, if not set forth in such amendment, in which any exchange, reclassification, or cancellation of issued shares provided for in the amendment shall be effected, is as follows: (If no change, so state)

No Change

EIGHTH: The manner in which such amendment effects a change in the amount of stated capital, and the amount of stated capital as changed by such amendment, are as follows: (If no change, so state)

No Change

Dated ___January 8___, 19 73

Mark Steven, Inc.

By _____

Its _____ President

and _____

Its _____ Secretary

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE } Sc.

At ___Woonsocket_____ in said county on this___8th_____day of
___January_____, 19_73 personally appeared before me___Sidney___
S._Goldstein____, who, being by me first duly sworn, declared that he is the _____
___President_____ of ___Mark Steven, Inc._____

that he signed the foregoing document as_____President_____ of the
corporation, and that the statements therein contained are true.

_____
                                    Notary Public

(NOTARIAL SEAL)                   My Commission Expires June 30, 1976.

# State of Rhode Island and Providence Plantations

## ORIGINAL ARTICLES OF ASSOCIATION

### (BUSINESS CORPORATION)

Know all Men by these Presents, That we Michael A. Silverstein, John M. Parsons and Max Wistow

all of lawful age, hereby agree to and with each other:

FIRST. To associate ourselves together with the intention of forming a corporation under and by virtue of the powers conferred by Chapters 7-1 to 7-5 (inclusive), 7-9 and 7-10 of the General Laws of Rhode Island, as amended.

SECOND. Said corporation shall be known by the name of

Mark Steven, Inc.

THIRD. Said corporation is formed (as permitted by § 7-2-3 of the General Laws) for the purpose of

In addition to the foregoing, said corporation shall have the following powers and authority, viz:— (See § 7-2-10 of the General Laws.)

To do any lawful act which is necessary or proper to accomplish the purposes of its incorporation. Without limiting or enlarging the effect of this general grant of authority, it is hereby specifically provided that every corporation shall have power:

(a) to have perpetual succession in its corporate name, unless a period for its duration is limited in its articles of association or charter;

(b) to sue and be sued in its corporate name;

(c) to have and use a common seal, and alter the same at pleasure;

(d) to elect such officers and appoint such agents as its business requires, and to fix their compensation and define their duties;

(e) to make by-laws not inconsistent with the Constitution or laws of the United States or of this state, or with the corporation's charter, or articles of association, determining the time and place of holding and the manner of calling and of conducting meetings of its stockholders and directors, the manner of electing its officers and directors, the mode of voting by proxy, the number, qualifications, powers, duties and term of office of its officers and directors, the number of directors and of shares of stock necessary to constitute a quorum, which number may be less than a majority, and the method of making demand for payment of subscriptions to its capital stock, and providing for an executive committee to be elected from and by the board of directors and defining its powers and duties, and containing any other provisions, whether of the same or of a different nature, for the management of the corporation's property and the regulation and government of its affairs;

(f) to make contracts, incur liabilities and borrow money;

(g) to acquire, hold, sell and transfer shares of its own capital stock; provided, that no corporation shall use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the capital of the corporation;

(h) to acquire, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of any bonds, securities or evidences of indebtedness created by, or the shares of the capital stock of, any other corporation or corporations of this state or of any other state, country, nation or government, and while owner of said stock to exercise all the rights, powers and privileges of ownership, including the right to vote thereon;

(i) to guarantee, purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of any bonds, securities or evidences of indebtedness created by or dividends on or a certain amount per share in liquidation of the capital stock of any other corporation or corporations created by this state or by any other state, country, nation or government;

(j) to acquire, hold, use, manage, convey, lease, mortgage, pledge or otherwise dispose of within or without this state any other property, real or personal, which its purposes shall require;

(k) to conduct business and have offices in this state and elsewhere; provided, however, that nothing in this section contained shall authorize any corporation to carry on the business of a bank, savings bank or trust company.

(OVER)

FOURTH.   Said corporation shall be located in ....Woonsocket........., Rhode Island.
                                                              (City or Town)

FIFTH.   The TOTAL amount of authorized capital stock of said corporation, with par value, shall be............................................($............) dollars as follows, viz:
Common stock in the amount of......................................................................($............)
dollars to be divided into..........................................................(............) shares of
the par value of..........................................................($............) dollars each; and
Preferred stock in the amount of.........................................................($............)
dollars, to be divided into.........................................................(............) shares, of
the par value of..........................................................($............) dollars each.

(Or if capital stock is without par value)

The TOTAL number of shares of capital stock authorized, without par value, shall be

............................One Thousand.............................( 1,000 ) shares

as follows, viz:—       One Thousand                ( 1,000 ) shares of

Common stock, without par value; and

............................None.............................(............) shares of

Preferred stock, without par value.

(If capital stock is divided into two or more classes) Description of several classes of stock, including terms on which they are created, and voting rights of each, viz:—

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

..............................................................................................................

SIXTH.   (If not perpetual) The period of duration of said corporation shall termin
uate   Be perpetual.

(Further provisions not inconsistent with law)

SEVENTH

EIGHTH

NINTH

**In Testimony Whereof,** We have hereunto set our hands and stated our residences this _____ 5ᵗʰ _____ day of _____ November _____, A. D. 19 69

| NAME | RESIDENCE (No. Street, City or Town) |
|---|---|
| *Michael A. Silverstein* | 28 Kennedy Boulevard, Lincoln, R.I. |
| *John M. Parsons* | 8 Ferncrest Drive, Cumberland, R.I. |
| *Max Wistow* | 179 Oakley Road, Woonsocket, R.I. |

STATE OF RHODE ISLAND,　}　In the　City　{ of _____ Woonsocket _____

COUNTY OF Providence　}　　　xTown　{

in said county this _____ 5th _____ day of _____ November _____, A. D. 19 69

then personally appeared before me Michael A. Silverstein, John M. Parsons

and Max Wistow

each and all known to me and known by me to be the parties executing the foregoing instrument, and they severally acknowledged said instrument by them subscribed to be their free act and deed.

_____
　　　　　　　　　　　　　Notary Public

1235

(BUSINESS CORPORATION)

ORIGINAL

ARTICLES OF ASSOCIATION OF

Mark Steven, Inc.

215 CO*****5.00

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
NOV 7 1969 19

Buying, selling, packaging, manufacturing, processing, distributing, consigning and otherwise dealing in articles generally sold in health and beauty aid stores, drug stores and markets, including without limitation, drugs, drug sundries, patent medicines, pharmaceutical supplies, dental items, surgical apparatus, physicians' and hospital supplies; cosmetics, perfumeries, deodorants, soaps, lotions, and toilet articles; baby care supplies; cigarettes, cigars, tobaccos, tobacco products and smokers' accessories; ladies' hosiery, women's wearing apparel and costume jewelry; newspapers, books, including paperbacks, magazines and periodicals; greeting cards, gift wrappings, stationery, office and school supplies and paper products; candies, nuts, confections, food specialties and non-alcoholic beverages; pet supplies; party goods, fancy goods, notions, gift items and glassware; musical records and tapes; cameras, film and photographic supplies; household and hardware items; and other similar articles.

To acquire by purchase, exchange, lease, or otherwise and to own, hold, use, operate, sell, assign, lease, transfer, convey, exchange, mortgage, pledge or otherwise dispose of or deal in and with, personal property of every class or description and such real property and all interests therein as may be required for the furtherance of the business of the corporation.

To draw, make, accept, endorse, discount, execute, and issue promissory notes, drafts, bills of exchange, warrants, bonds, debentures, and other negotiable or transferable instruments and evidences of indebtedness whether secured by mortgage or otherwise, as well as to secure the same by mortgage or otherwise, so far as may be permitted by the laws of the State of Rhode Island.

To apply for, register, obtain, purchase, lease, take licenses in respect of or otherwise acquire, and to hold, own, use, operate, develop, enjoy, turn to account, grant licenses and immunities in respect of, manufacture under and to introduce, sell, assign, mortgage, pledge or otherwise dispose of, and, in any manner deal with and contract with reference to:

> (a)  inventions, devices, formulae, processes and any improvements and modifications thereof;

> (b)  letters patent, patent rights, patented processes, copyrights, designs, and similar rights, trade-marks, trade symbols and other indications of origin and ownership granted by or recognized under the laws of the United States of America or of any state or subdivision thereof, or of any foreign country or subdivision thereof, and all rights connected therewith or appertaining thereunto;

> (c)  franchises, licenses, grants and concessions.

To purchase or otherwise acquire, and to hold, mortgage, pledge, sell, exchange or otherwise dispose of, securities (including, without limitation of the generality thereof, any shares of stock, bonds, debentures, notes, mortgages, or other obligations, and any certificates,

receipts or other instruments representing rights to receive, purchase or subscribe for the same, or representing any other rights or interests therein or in any property or assets created or issued by any persons, firms, associations, corporations, or governments or subdivisions thereof; to make payment therefor in any lawful manner; and to exercise, as owner or holder of any securities, any and all rights, powers and privileges in respect thereof.

To make, enter into, perform and carry out contracts of every kind and description with any person, firm, association, corporation or government or subdivision thereof.

To acquire by purchase, exchange or otherwise, all, or any part of, or any interest in, the properties, assets, business and good will of any one or more persons, firms, associations or corporations heretofore or hereafter engaged in any business for which a corporation may now or hereinafter be organized under the laws of the State of Rhode Island; to pay for the same in cash, property or its own or other securities; to hold, operate, reorganize, liquidate, sell or in any manner dispose of the whole or any part thereof; and in connection therewith, to assume or guarantee performance of any liabilities, obligations or contracts of such persons, firms, associations, or corporations, and to conduct the whole or any part of any business thus acquired.

To lend its uninvested funds from time to time to such extent, to such persons, firms, associations, corporations, governments or subdivisions thereof, and on such terms and on such security, if any, as the Board of Directors of the corporation may determine.

To endorse or guarantee the payment of principal, interest or dividends upon, and to guarantee the performance of sinking fund or other obligations of any bonds, securities or evidence of indebtedness, and to guarantee in any way permitted by law the performance of any of the contracts or other undertakings in which the corporation may otherwise be or become interested, of any persons, firm, association, corporation, government or subdivision thereof, or of any other combination, organization or entity whatsoever.

To borrow money for any of the purposes of the corporation, from time to time, and without limit as to amount; from time to time to issue and sell its own securities in such amounts, on such terms and conditions, for such purposes and for such prices, now or hereafter permitted by the laws of the State of Rhode Island and by the Articles of Association of this corporation, as the Board of Directors of the corporation may determine; and to secure such securities by mortgage upon, or the pledge of, or the conveyance or assignment in trust of, the whole or any part of the properties, assets, business and good will of the corporation, then owned or thereafter acquired.

To purchase, hold, cancel, reissue, sell, exchange, transfer or otherwise deal in its own securities from time to time to such an extent and in such manner and upon such terms as the Board of Directors of the corporation shall determine, provided that the corporation shall not use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of its capital, except to the extent permitted by law; and provided further that shares of its own capital stock belonging to the corporation shall not be voted upon directly or indirectly.

To organize or cause to be organized under the laws of the State of Rhode Island, or of any other state of the United States of America, or of the District of Columbia, or of any territory, dependency, colony or possession of the United States of America, or of any foreign country, a corporation or corporations for the purpose of transacting, promoting or carrying on any or all of the objects or purposes for which the corporation is organized, and to dissolve, wind up, liquidate, merge or consolidate any such corporation or corporations, or to cause the same to be dissolved, wound up, liquidated, merged or consolidated.

To conduct its business in any and all of its branches and maintain offices both within and without the State of Rhode Island, in any and all States of the United States of America, in the District of Columbia, in any or all territories, dependencies, colonies or possessions of the United States of America, and in foreign countries.

To such extent as a corporation organized under the laws of the State of Rhode Island may now or hereafter lawfully do, to do either as principal or agent and either alone or in connection with other corporations, firms, or individuals, all and everything necessary, suitable, convenient or proper for, or in connection with, or incident to, the accomplishment of any of the purposes or the attainment of any one or more of the objects herein enumerated, or designed directly or indirectly to promote the interests of the corporation or to enhance the value of its properties; and in general to do any and all things and exercise any and all powers, rights and privileges which a corporation may now or hereafter be organized to do or to exercise under the laws of the State of Rhode Island or under any act amendatory thereof, supplemental thereto or substituted therefor.

The foregoing provisions hereof shall be construed both as purposes and powers and each as an independent purpose and power. The foregoing enumeration of specific purposes and powers shall not be held to limit or restrict in any manner the purposes and powers of the corporation, and the purposes and powers herein specified shall, except when otherwise provided for herein, be in no wise limited or restricted by reference to, or inference from, the terms of any provisions of this or any other portion of the Articles of Association; provided that the corporation shall not carry on any business or exercise any power in any state, territory or country which under the laws thereof the corporation may not lawfully carry on or exercise.